## UNITED STATES *v.* BARNHART, (four cases.)

*(District Court, D. Oregon.* December 26, 1887.)

1. PUBLIC LANDS—SELECTION OF SWAMP LANDS—REGULATIONS OF LAND-OFFICE.

The regulation of March 13, 1875, made by the commissioner of the general land-office concerning the character and quantum of evidence to be furnished the surveyor general with selections of land made by the agent of the state as swamp, under the act of March 12, 1860, is an appropriate regulation of that subject, and, until the contrary appears, it is presumed to have been made under the direction and with the sanction of the secretary of the interior, and has the force and effect of law.

2. SAME—SELECTION OF SWAMP LANDS—FORGED AFFIDAVIT.

A forged affidavit is within the purview of section 5418, Rev St., when it appears therefrom, or in connection with extraneous circumstances alleged in the indictment, that it may be used to defraud the United States, as alleged.

3. SAME—SELECTION OF SWAMP LANDS—AFFIDAVIT.

An affidavit may be used as evidence, under the regulation of March 13, 1875, to prove the character of lands selected by the state as swamp and overflowed, under the act of May 12, 1860, whether made before or after such selection: and if made before, and presented to the governor for his consideration in making such selection, the presumption is that he transmitted the same, with the selection to which it relates, to the surveyor general.

4. SAME.

The regulations of June 30, and September 1, 1880, by which the land department of the United States, in conjunction with the state, undertook, by means of agents in the field, to examine the character of the lands claimed by the state under the swamp-land grant thereto, superseded the regulation of March 13, 1875; and thereafter no affidavit could be legally used before the commissioner or secretary of the interior on the consideration of the question whether such lands were swamp or not, other than the affidavits of the agents employed to make such examination in the field, and therefore the affidavits alleged in the indictment to have been forged by the defendant could not have been legally used to defraud the United States.

*(Syllabus by the Court.)*

Indictment against defendant, William H. Barnhart, under Rev. St. U. S. § 5418, for the forgery of certain affidavits, with intent to defraud the government.

*Lewis L. McArthur,* for the Government.

*Charles B. Bellinger* and *H. Y. Thompson,* for defendant.

(No. 2,048.)

DEADY, J. The indictment in this case was found on April 11, 1887. By it the defendant was accused of violating section 5418, Rev. St., which provides as follows: "Every person who falsely makes, alters, forges, or counterfeits any * * * affidavit * * * for the purpose of defrauding the United States, or utters or publishes as true any such * * * affidavit * * * for such purpose, knowing the same to be false, forged, or counterfeited, or presents at the office of any officer of the United States any such * * * affidavit, * * * knowing the same to be false, forged, altered, or counterfeited for such purpose,"shall be punished by imprisonment not more than 10 years or by a fine of not more than $1,000. The indictment contains three counts. The first one charges the forging, the second the uttering, and the third the transmitting of such an affidavit, with intent to defraud the United States.

It is stated in the first count, that on April 7, 1875, the commissioner of the general land office made a regulation that the testimony of at least two witnesses would be required to establish the swampy and overflowed character of lands, to be selected by the state of Oregon under the act of congress granting swamp lands thereto; that, prior to September 25, 1884, Henry C. Owen had filed with the proper state board applications to purchase from the state swamp and overflowed lands, to be so selected, that embraced large tracts of land not swamp or overflowed; that on said date the defendant was the agent for Owen to obtain proof in connection with such applications, and then and prior thereto well knew that they embraced lands not swamp or overflowed; that, under the practice permitted by the governor, the defendant was allowed to present to and have considered by the former, affidavits to prove the swampy and overflowed character of lands within the state; that on September 25, 1884, the defendant, intending to defraud the United States, "did falsely make, forge, and counterfeit a certain writing on paper purporting to be an affidavit of D. M. McMenamy and I. L. Poujade," to the effect that a certain list of lands thereto attached, aggregating 8,800 acres, and lying and being in township 23 north, and range 32½ east, then were, and since March 12, 1860, had been, swamp and overflowed, and therefore unfit for cultivation. It is then alleged that this affidavit was so forged by the defendant with intent to defraud the United States of the title and possession of certain of the lands mentioned in said list, which were not, on March 12, 1860, nor since, swamp or overflowed lands, but public lands of the United States.

The second count contains the same matter of inducement as the first, and charges that on some day between September 25 and November 11, 1884, the defendant having said forged affidavit in his possession, did utter the same to the governor of Oregon, well knowing that it was his practice and duty to examine swamp-land proofs, and transmit the affidavits in relation thereto to the surveyor general of the United States for the district of Oregon, which uttering was done by the defendant, with intent to defraud the United States of the title and possession of the public lands aforesaid.

The third count repeats the matter of inducement, and charges that on November 11, 1884, the defendant did transmit to the office of the surveyor general aforesaid, said forged affidavit, with intent to defraud the United States of the title and possession of the public lands aforesaid.

The proposition made in support of the demurrer is that it does not appear from anything contained in the indictment that the title of the United States to any of the lands in question could be affected by this affidavit, whether true or false; citing the rule laid down in Hammond's. Digest, and approved in People v. Stearns, 21 Wend. 414,—"that how clear soever the fraudulent purpose, unless the writing is sufficient to accomplish that purpose, it is not forgery; since, with a single exception, actions only, and not evil intentions, are punishable by the English law, and actions only which actually do or possibly may produce injustice." Section 453, Rev. St., authorizes and requires the commissioner of the gen-

eral land-office, under the direction of the secretary of the interior, "to perform all executive duties" respecting the public lands; and section 2478 of the same gives the commissioner authority, under the same direction, "to enforce and carry into execution, by appropriate regulations," every part of title 32, "not otherwise specially provided for." The act of March 12, 1860, making the grant of swamp and overflowed lands to Oregon, is a part of this title.

By a letter dated "DEPARTMENT OF THE INTERIOR, GENERAL LAND-OFFICE, WASHINGTON, D. C., April 7, 1875," and addressed to the "U. S. SURVEYOR GENERAL, EUGENE, OREGON," the commissioner of the general land-office called the attention of that officer to the extract therein contained from a letter of that office to the governor of Oregon, dated March 13, 1875, in regard to swamp lands. The extract from the letter to the governor prescribes the proof to be furnished of the character of such lands as follows: "When selections are made by the state agents they are to be forwarded to the United States surveyor general with the evidence of the swampy character of the lands." The regulation then proceeds to specify, at some length, the particulars "the evidence must designate," and concludes: "In short, the evidence should be as full and complete, as if required to establish the character of each tract to the satisfaction of a court or a jury." The letter to the surveyor general then proceeds:

"On the receipt of such selections you will examine the evidence in support of the swampy character of the land at as early a period as practicable, and report to this office such lands as in your opinion are shown to be swampy or overflowed, and rendered thereby unfit for cultivation, together with the evidence presented to you. You will also forward to the United States land-office of the district in which such lands are situated a list of the lands thus shown in your opinion to be swampy, with a certificate stating that satisfactory evidence has been presented to you that said lands are so swampy or overflowed as to render them unfit for cultivation."

By the act of 1878 (Sess. Laws, 41) the governor is appointed land commissioner for the state, and is authorized, in person or by an agent, "to select" and "locate the lands to which the state is entitled under the laws of the United States," including swamp and overflowed lands. In the discharge of this duty he is required "to prepare accurate lists of the lands by him selected in duplicate, in the manner prescribed by the laws of the United States and the instructions of the commissioner of the general land-office; * * * one copy of which he shall forward to the register of the land-office in the district where the lands selected are situated; the other shall be deposited with the secretary of state, who shall record the same in a book to be kept for that purpose." The regulation made by the commissioner concerning the selection of swamp lands in Oregon, under the act of 1860, appears to be appropriate to the execution thereof, and has therefore the force and effect of law. The general land-office is a bureau of the department of the interior, and any regulation concerning the disposition of the public lands made by the commissioner and within the scope of his authority is presumed to have been made under the direction and with the sanction of the secretary, until

the contrary appears. For all practical purposes such regulation is not only the act of the secretary, but of the president, for whom he stands, and is therefore an "executive act," of which the courts take judicial notice. *Poppe* v. *Athearn*, 42 Cal. 609; *U. S.* v. *Adams*, 11 Sawy. 107; *U. S.* v. *Hearing*, Id. 514. /

The only national authority for the taking or use of an affidavit in connection with the selection of swamp lands is this regulation made by the commissioner on March 13, 1875. The language of the regulation is: "When selections are made by the state agents, they are to be forwarded to the United States surveyor general, with the evidence of the swampy character of the lands." An affidavit is "evidence" within the meaning of the term as used in this regulation. The testimony of a witness, to be used in the general or local land-offices in proof of facts relative to the disposition of the public lands, is commonly taken by affidavit. But the regulation is limited by its terms to "selections made by the state agents." Evidence by affidavit or otherwise as to the character of lands is neither required nor authorized, unless the same have been selected by the state, in which case it is to be forwarded to the surveyor general, with the selection, for his opinion and report thereon, to the general land-office, as provided in the letter of the commissioner of April 7, 1875. On this state of law and fact counsel for the defendant insist that it does not appear from the indictment that any of the lands in question had been selected by an agent of the state, at date of this alleged forgery; and therefore the affidavit could not have been used before the surveyor general as evidence of their swampy character. Or, as stated in their brief, "the only affidavits which the surveyor general is required or authorized to receive or consider or forward to his superior, and therefore the only affidavits which can possibly aid the alleged fraudulent object, are those which accompany and refer to selections made by the state agents." The affidavit must have been made, uttered, or transmitted with intent to defraud the United States; and if such intent is not manifest and possible on the face of the writing, extrinsic facts must be stated to make it so. The indictment undertakes to show by the statement of such facts that the tendency of the forgery, and the intent of the defendant in making it, was to defraud the United States of the title to the lands in question; and it must at least appear therefrom that it was possible for the affidavit to have been used so as to produce such a result.

From the passage of the act of 1870, (Sess. Laws, 54,) any person over 21 years of age who was a citizen of the United States, or who had declared his intention to become such, might become an applicant for the purchase of "any tract or tracts" of swamp land, whether surveyed or unsurveyed, by filing his application with the governor, who was made land commissioner for such purpose. Twenty per centum of the purchase price—$1 per acre—was to be paid within 90 days from public notice that the same had been selected by the governor as swamp and overflowed, which he was authorized to do, and the balance on proof of reclamation when a patent from the state was to issue to the applicant.

But if final payment and proof of reclamation were not made within 10 years from the first payment, the land was to revert to the state. This act was repealed by the act of 1878, *supra;* and all applications made under it, if not regularly made, or in which the subsequent terms of the act were not complied with, are declared void, while all other applications under the act are recognized as valid and continued in force.

It appears from the indictment that Owen had made application to purchase over 8,000 acres of land from the state as swamp, and that such application was pending on September 25, 1884, when this false affidavit was forged. This application must have been made under the act of 1870, for that of 1878 does not permit a sale of more than 320 acres to any one person. The application might have been submitted under either act to the governor for his approval and adoption of the selections therein contained. There is nothing in either of these acts to prevent him from making his selections through the agency of an applicant for purchase, or allowing him to furnish the evidence required by the regulation of the general land-office as to the character of the land. The governor was authorized by both acts to employ agents to make the selections, or he might make the selection himself upon evidence procured or obtained in any way he might deem proper and expedient. Certainly it could not have been expected, under the circumstances, that he would go upon the ground and make the selection in person. I do not think the regulation of March 13, 1875, contemplates or requires, as the argument for the demurrer assumes, that the selection of a tract of land, as swamp, shall be made by the governor or other agent of the state, before the evidence (affidavits) of the witnesses in support of the selection are taken. On the contrary there is nothing to prevent the affidavits from being made first, and the selection made by the governor thereafter and thereupon; and every consideration of convenience points to this mode of proceeding. Indeed, the governor could not make a selection in his office without the proof before him of the swampy character of the land; and, knowing what proof the land department of the United States required before the selection would be adopted thereby, he would naturally and properly, and in the line of his duty, require the same to be presented to him, and thereafter transmit it, with the selection, to the surveyor general.

Now, it appears from the indictment that the defendant, under the method of practice adopted by the governor, was permitted to present and have considered by him, affidavits to prove the swampy and overflowed character of lands within this state. Under these circumstances it is alleged in the indictment that the defendant presented the affidavit in question to the governor for his consideration in determining the character of the lands contained in the Owen application. Assuming what the demurrer admits, that the affidavit was forged by the defendant, with intent to defraud the United States of the title to a considerable portion of the lands therein mentioned, which are not and never were swamp or overflowed,—could the same have been legally used so as to produce or aid in producing such result? On this statement of the case

the question must be answered in the affirmative. If the governor found the lands were swamp and overflowed, within the meaning of the act of March 12, 1860,—as it must be presumed he would on such evidence,—he would approve the selection and forward the same to the surveyor general with the evidence,—the affidavit,—who would in turn report the same to the general land-office with his opinion thereon; and, if the forgery was not detected, in all probability the fraud would prove successful. The affidavit was evidently drawn with the regulation of March 13, 1875, in view. It contains all the particulars concerning the character and condition of the lands thereby required; and, if genuine, it might legally be used to enable the governor to select the lands therein mentioned, as swamp and overflowed; and also as evidence of such fact in the land department of the United States. And so the case made in the indictment comes fully within the rule cited by counsel for the defendant from *People* v. *Stearns*, 21 Wend. 414: "The writing is sufficient to accomplish the purpose," to defraud the United States of the title to the lands in question; and it is sufficient if it "possibly may produce" such a result. The consideration of the demurrer to the first count disposes of it as to the second and third ones.

Assuming, what the demurrer admits, that the defendant knowingly uttered such false affidavit as true, for the purpose of defrauding the United States of certain lands, when he delivered the same to the governor, as evidence of their swampy character, and thereafter by such means intentionally transmitted the same to the surveyor general for a like purpose, a case under the statute is made in each of said counts; the one of knowingly uttering or publishing the forgery, and the other of transmitting the same to an officer of the United States, with intent to defraud.

---

### (Nos. 2,049, 2,050, and 2,051.)

The defendant is accused by the indictments in these three cases of forging, uttering, and transmitting two other affidavits purporting to be those of said McMenamy and Poujade, and another purporting to be that of D. A. Lambert and S. R. Jones, for the purpose of defrauding the United States of the title to certain lands therein mentioned. The cases were submitted on demurrers to the indictments with the foregoing one. The case made in the indictments, and the questions raised on the demurrers, are the same as in the foregoing case, and the same disposition is made of them.

---

### REARGUMENT.

### (January 10, 1888.)

Deady, J. Upon the delivery of the foregoing opinion leave was given, on the application of counsel for the defendant, to reargue the case, which was done on January 3, 1888. On this argument counsel for the defendant contended that the regulation of March 3, 1875, pro-

viding that when selections of swamp land are made by an agent of the state they must be forwarded to the department through the office of the surveyor general, with the evidence of their swampy character, was superseded and set aside before September 25, 1884, the date of the forged affidavit, by the instructions of the commissioner to agent R. V. Ankeny, of June 30 and September 1, 1880, made in pursuance of an arrangement with the governor of the state, by which the proof of the swampy character of all lands claimed by the state under the swamp land grant was to be furnished by the affidavits of the department and state agents, who might examine the same in the field. The conclusion reached on the first hearing, that the affidavit in question might lawfully have been used to defraud the United States of the title to certain lands, is founded on the assumption that the regulation of March 13, 1875, was then in force, and had the effect of law. Without it, it was not contended there was any case against the defendant, for with whatever intention the affidavit was made, but for this or some similar regulation, making it legal evidence before the United States land department of the swampy character of the lands therein referred to, it could not be lawfully used for such purpose.

After a somewhat extended examination of the subject among the sources of information within my reach, the regulations of the land department applicable to the matter appear to be as follows: Soon after the passage of the swamp-land act of September 28, 1850, to-wit, on November 21st of that same year, the commissioner issued a circular to the governors of the states to which the grant applied, allowing them to elect which of two methods they would adopt for the purpose of designating the swamp lands within the limits of their respective states, namely, the field notes of the United States surveys or selections made by the agent of the state, to be reported to the surveyor general, with proof of the character of the same. This option was also offered to this state after the grant had been extended here by the act of March 12, 1860. By the act of October 26, 1870, (Sess. Laws, 54,) Oregon elected to select the lands, and authorized the governor to make the selections in person or by agents appointed for that purpose. Selections were made in this way until 1880, when, at the suggestion of the governor of the state, the commissioner appointed R. V. Ankeny to examine in the field the lands claimed by the state, which had not been passed on by the department, and directed him to confer with the state authorities, and to act with any agent they might appoint. Ankeny was also instructed to transmit to the commissioner lists of the tracts concerning which he and the state agent agreed, "with testimony touching the character of said tracts;" and, in case of disagreement between them, Ankeny was to report his opinion of the tract "with like testimony." The governor appointed Charles Whiteaker as agent for the state. On September 1, 1880, the commissioner, in response to a communication from Ankeny, of August 4th, instructed him that he and the state agent were jointly to examine the lands claimed by the state as swamp, "and make out lists of such tracts and attach their affidavits thereto, setting forth the facts relative

to your examination of the lands and the character of the same. Said affidavits are what was referred to in your instructions as 'testimony.'" Thereupon the agent of the department and the state began the examination in the field of the land claimed by the state, and made reports thereon, as provided in the instructions. And this method was, and still is, pursued in the examination and proof of the character of the lands claimed by the state under the grant of March 12, 1860; the commissioner, under the direction of the secretary of the interior, approving the selection, or refusing to do so, o i the information contained in the affidavits of these agents, and in can of a disagreement by reference to the field notes of the United States surveys.

On January 24, 1885, (3 Dec. L. D. 384,) Acting Secretary Joslyn decided, on appeal from the decision of the commissioner, rejecting the claim of the state to about 48,000 acres of land, on the report and affidavits of these agents, that they were not swamp or overflowed, that the arrangement between the department and the state which resulted in the appointment of agents to examine the lands in the field was binding on the latter, and that under it the testimony of no witness could be introduced to prove the character of the land, other than that of these agents. This decision was subsequently, March 3, 1885, affirmed by Secretary Teller, (3 Dec. L. D. 467,) and by Acting Secretary Muldrow, June 19, 1885, (3 Dec. L. D. 595;) and lastly by Secretary Lamar, August 7, 1886, (5 Dec. L. D. 31.) On January 29, 1881, the governor of the state wrote to the commissioner, and stated that the appointment of the "agent to examine in the field lands claimed by the state under the swamp-land grant" was done "in pursuance of a request from" his office, and "that the system thus adopted," in his opinion, "will prove highly successful." After speaking of the appointment of the state agent, Whiteaker, to co-operate with Ankeny, the agent of the department, he further states that he is very anxious that the system "be continued;" and that he has learned that the agent of the department "has received instructions * * * to examine no lands except lists furnished from" the office of the commissioner. He then says:

"The mode formerly pursued was to file lists claimed by the governor as swamp lands with the surveyor general of Oregon, with proof of their swampy character; who, if he approved the same, forwarded them to your office for confirmation. Under the present system, the former mode could be well dispensed with, in my judgment, and the governor allowed to forward the lists in the first instance to your office, and without any proof of the swampy character of the land claimed. You will no doubt agree with me that proofs in the form of *ex parte* affidavits are of the most unsatisfactory kind, and that such proofs are wholly unnecessary, when the agent examines the land personally. There is a large amount of swamp lands in the state, some of which have been claimed, and the lists filed in the office of the surveyor general of Oregon, and which have not been forwarded on account of a defect of proof; and others have been returned to this office. In view of these circumstances, I have caused lists to be made of all these lands, and herewith forwarded them to you, trusting that you will allow them to be filed in your office, and forward copies to General Ankeny, with instructions to examine and report as to the character of the lands included in such lists; and that you will permit

me to forward other lists of a like character from time to time, as they may be returned to me by agents appointed on the part of the state, to examine lands and return lists of those they believe to be swamp and overflowed, within the meaning of the swamp-land grant. By this means the work of segregation can be kept moving forward, until the state shall receive the full benefit of the grant."

But notwithstanding the adoption of the new system of ascertaining the character of the lands claimed by the state, and the decision of department that the testimony of no other persons than the agents who made the examination in the field could be used as evidence before the commissioner or secretary in the determination of the question whether lands claimed by the state are in fact swamp; and notwithstanding the governor proposed to and actually did forward lists of state selections directly to the office of the commissioner, without any affidavits as to their swampy character, still it appears from the files of the surveyor general's office that the practice of sending the lists of state selections through such office, with affidavits as to their swampy character, was resumed and continued by the executive of the state. Indeed, the affidavits in question appear to have been so forwarded by the governor with the list of lands to which they relate, and by the surveyor general transmitted to the office of the commissioner, from whence they were returned here, to be used as evidence in this case. And as late as July 20, 1887, the governor forwarded to the surveyor general two lists of state selections, containing 3,694.69 acres, with the affidavits of two persons as "proof of their swampy character." On September 27th, the surveyor general forwarded the same to the commissioner for his action, and at the same time certified that he had "compared the area of the tracts shown on the lists with the areas shown on the original plats of surveys on file" in his office, and that, in the few instances in which they did not agree, he had made "the necessary corrections    *    *    *    on the margin of the lists;" and on October 6th the commissioner acknowledged the receipt of the lists and proof. On September 14, 1887, Acting Commissioner Stockslager, in response to a letter from the surveyor general, wrote him that the "instructions" required him to examine the evidence furnished with the lists of lands filed in his office to show their character, and forward to that office a list of such tracts as he may find to be swamp, within the meaning of the grant, together with the evidence in support thereof.

In this state of apparent confusion and contradiction of instruction, decision, and practice on this subject in the land department, it may be admitted that the affidavits in question, and others like them, have been used since 1880 to verify the claim of the state to tracts of land selected by its agents under the swamp-land grant, so as to entitle the lists thereof to be filed in the office of the surveyor general, and there examined and compared with the original plats of surveys for quantity, preparatory to being transmitted to the office of the commissioner for the action and consideration of the department. That there is any real necessity for these affidavits in this connection is not apparent. As was suggested in the executive communication of January 29, 1881, they are a very un-

satisfactory kind of evidence at best.   The affidavits being in due form, and containing the stereotyped statements as to the character of the land, the action of the surveyor general thereon is the merest empty formality. Assuming, as he must, that the affiants, whoever they may be, and however irresponsible they are, speak the truth, he can but pass the list to the department as containing swamp land.   Under the circumstances, the official claim of the executive of the state that certain lands selected by its agents under the swamp-land grant are swamp, ought to be a sufficient verification of the fact to entitle the list thereof to be filed in the office of the surveyor general for comparison as to quantity, and transmission to the commissioner for the action and consideration of the department.   And any evidence which may be submitted or used by the governor in preparing these lists and this claim on behalf of the state, ought to be considered a matter solely pertaining to his office, and remain there.   But be this as it may, it must be admitted that under the regulations of the commissioner, as construed by himself and the secretary, the affidavit in question could not when made, nor since 1880, have been used as evidence before either of those officers in the investigation or determination of the question whether the lands to which it relates are swamp or not.   And, unless it could have been so used, it could not be used to defraud the United States of its title to such lands, as alleged in the indictment.   It is true, the affidavit might have been used, and, so far as appears, was used, to influence the action of the surveyor general; but the action of that officer was only preliminary to the presentation of the claim of the state to the department for investigation and determination, and had no effect whatever on the title of the United States to the lands in question.   Admitting, as the demurrer does, that the defendant, as charged in the third count, transmitted this affidavit to the surveyor general by the hands of the governor, with the intent to defraud the United States of the title to these lands, still it must be sustained, unless any action which that officer might lawfully take thereon would have the effect to defraud the United States, as alleged, or materially aid in so doing.   His action alone could not possibly have such effect, for he had no power over the question on which the title depended, or the evidence on which it was to be determined.   Nor, in my judgment, could such action have materially aided in producing such a result.   Based on this affidavit in part, the surveyor general might, and probably did, transmit the claim of the state to the list of lands to which it was attached to the commissioner for final disposition.   The affidavit was then *functus officio*, and the title to the land was wholly unaffected by it.   The United States could not be deprived of it except by the judgment of the secretary of the interior, based on the evidence or information contained in the affidavits of the agents who examined the lands in the field.

For these reasons I am constrained to change the ruling on the demurrer to the indictment, and it is now sustained.